**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ERIC BARGER, *et al.*,

    Plaintiffs,

v.

EMC MORTGAGE CORPORATION, *et al.*,

    Defendants.

No. C 10-1152 SI

**ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

On September 2, 2011, the Court heard argument on plaintiffs' motion for class certification. Having considered the moving papers and the arguments presented, and for good cause appearing, the Court hereby DENIES plaintiffs' motion.

**BACKGROUND**

On January 12, 2009, plaintiffs Erik Barger and Kimberly McCoy purchased a bank-owned property located in Novato, California. First Amended Complaint ("FAC"), ¶8; *see also* Declaration of Joshua Katz in Support of Plaintiffs' Motion for Class Certification ("Katz Decl."), Exh. 1. At the time of the sale, defendant EMC Mortgage Corporation ("EMC") was the owner of the property. Katz Decl., Exh. 1. The grant deed for the sale identifies defendant JPMorgan Chase Bank, N.A. ("Chase") as trustee, although Chase asserts that at the time the sale occurred it had sold its trust business and no longer acted as trustee. Katz Decl., Exh. 3; *see* Declaration of Paul D. Savitsky, ¶¶2-3 (stating that Chase sold its trust business in 2006).

The sale of the property was made pursuant to a document entitled "California Real Estate Purchase Contract and Escrow Instructions," a form contract created by EMC. *See* Katz Decl., Exh. 1.

Paragraph 14 of this contract provided that plaintiffs would pay for title insurance, and would use a title insurance provider of EMC's choosing:

> C. Buyer shall be provided at Buyer's expense a preliminary (title) report and a CLTA standard form Policy of Title Insurance, or if the Buyer agrees to pay as described below, an ALTA-R Policy of Title Insurance issued by a title insurance company designated by Seller.
>
> NOTE: . . . (4) If Buyer desires an ALTA-R owner's policy or other title coverage, Buyer shall so instruct Escrow Holder and pay the increased cost, if any, over a CLTA policy. (5) ALTA LENDER'S title insurance policy, if required, shall be paid by Buyer. . . .
>
> . . .
>
> E. Buyer and Seller instruct Escrow Holder to order a title search immediately from a title insurance company selected by Seller ("Title Company").

Katz Decl., Exh. 1 at ¶14, Exh. 2 at ¶14; *see also id.* Exh. 1 at ¶4.A ("Buyer and Seller agree that Escrow Holder shall be selected by the Seller.").[1]

Plaintiffs ultimately obtained a title insurance policy from Fidelity National Title Company ("Fidelity"), one of three title insurance companies that EMC used. Declaration of Erik Barger in Support of Plaintiffs' Motion for Class Certification ("Barger Decl."), ¶4 and Exh. 2; Declaration of Kimberly McCoy in Support of Plaintiffs' Motion for Class Certification ("McCoy Decl."), ¶4 and Exh. 2; Declaration of Michael G. Salemi in Support of Defendants' Oppositions to Plaintiffs' Motion for Class Certification ("Salemi Decl."), Exh. 16 at 99-101, 109. Plaintiffs purchased a California Land Title Association ("CLTA") policy for $2,249, and an American Land Title Association ("ALTA") policy for $968. Barger Decl., ¶4 and Exh. 2; McCoy Decl., ¶4 and Exh. 2.

---

[1] According to the California Department of Insurance:

A CLTA policy insures primarily against defects in title which are discoverable through an examination of the public record. This includes defects in title or recorded liens or encumbrances, such as unpaid taxes or assessments, and defects due to lack of access to an open street. A CLTA policy also covers a limited number of risks that are not discoverable through a search of the public records.

The ALTA policy provides greater coverage than the CLTA policy. Generally, the ALTA policy provides the same coverage as the CLTA policy, but also insures against defects, liens, encumbrances, easements, and encroachments and conflicts in boundary lines that are not reflected in the public records. Since an ALTA policy covers many "off-record" defects in title, the insurer will typically survey the property to be insured.

Katz Decl., Exh. 5.

Approximately one year after purchasing their home, plaintiffs filed suit against EMC and Chase in Alameda County Superior Court. After the matter was removed to this Court, plaintiffs filed an amended complaint. The amended complaint alleges that defendants' sales contract violated Section 9 of the Real Estate Settlement Procedures Act ("RESPA"). That section provides:

> (a) No seller of property that will be purchased with the assistance of a federally related mortgage loan shall require directly or indirectly, as a condition to selling the property, that title insurance covering the property be purchased by the buyer from any particular title company.
>
> (b) Any seller who violates the provisions of subsection (a) of this section shall be liable to the buyer in an amount equal to three times all charges made for such title insurance.

12 U.S.C. § 2608; *see also* FAC at ¶24. The amended complaint includes one cause of action for violation of this section of RESPA, and a second cause of action brought under California's Unfair Competition Law that is predicated on the alleged RESPA violation. FAC at ¶¶40-50.

The amended complaint also purports to represent a class of plaintiffs, and proposes as its preliminary class definition: "All persons who purchased real property located in California from any Defendant," where "Defendant directly or indirectly required use of a particular Title Insurance Company." FAC at ¶31. Plaintiffs now move to certify the class.

**LEGAL STANDARD**

Class actions are governed by Federal Rule of Civil Procedure 23. To obtain class certification, plaintiffs bear the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, *amended*, 273 F.3d 1266 (9th Cir. 2001). According to Rule 23(a), a district court may certify a class "only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Rule 23(b) sets forth three general types of class actions. Plaintiffs contend the class should be certified pursuant to Rule 23(b)(3), which requires the court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for

1 fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) ("When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." (internal quotation marks omitted)).

The Ninth Circuit has recently reaffirmed the principle that "[i]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met . . . ." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO v. ConocoPhilips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-79 (1974)); *see also id.* ("[N]othing in either the language or history of Rule 23 . . . gives the court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003). "Although certification inquiries such as commonality, typicality, and predominance might properly call for some substantive inquiry, the court may not go so far as to judge the validity of these claims." *United Steel*, 593 F.3d at 808 (internal quotation marks omitted); *see also Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975). However, although the Court may not require preliminary proof of the claim, it "need not blindly rely on conclusory allegations which parrot Rule 23 requirements. Courts may also consider the legal and factual issues presented by plaintiff's complaint." 2 Alba Conte & Herbert B. Newberg, Newberg on Class Actions, 7.26 (4th ed. 2005). Sufficient information must be provided to form a reasonable and informed judgment on each of the requirements of Rule 23. *See Blackie*, 524 F.2d at 901 n.17. In order to safeguard due process interests and the judicial process, the Court conducts an analysis that is as rigorous as necessary to determine whether class certification is appropriate. *See Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 (9th Cir. 2005); *see also Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982).

4

**DISCUSSION**

Plaintiffs move to certify a slightly different class than the class proposed in their amended complaint. Their new class definition would consist of "all persons who":

    a.    purchased real property in California, after January 7, 2006, where any defendant was the seller of the property; and

    b.    the contract for the sale of real property specified that the seller select the title insurer; and

    c.    the buyer paid for title insurance; and

    d.    the transaction was governed by RESPA.

Motion at 8.

Defendants' primary challenge to plaintiffs' certification analysis focuses on the requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members." *See* Fed. R. Civ. P. 23(b)(3); *see also Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (discussing certification under Rule 23(b)(3)). Specifically, the parties dispute the proof that is required to establish a violation of Section 9 of RESPA. At set forth above, Section 9 provides:

> (a) No seller of property that will be purchased with the assistance of a federally related mortgage loan shall require directly or indirectly, as a condition to selling the property, that title insurance covering the property be purchased by the buyer from any particular title company.

12 U.S.C. § 2608.

Plaintiffs contend that a Section 9 violation occurs whenever a contract "mandates that the seller selects the title insurer and the buyer pays for title insurance." Motion at 12. Thus, they claim that a defendant's culpability can be assessed simply by looking at the real estate contract used in the sale, and that no additional evidence is needed to establish that a RESPA violation occurred. Further, because defendants used form contracts for their sales of real property during the class period, plaintiffs argue that defendants' liability can easily be ascertained on a classwide basis. Thus, plaintiffs argue that "no individual testimony is necessary" to prove their case, and that common questions predominate. Motion at 13.

Defendants disagree with plaintiffs' predominance analysis. They contend that the proper

1 inquiry is "whether the [buyer] had to pay for and use a particular title insurer in connection with the 2 purchase of the . . . property *as a condition to the sale* of that property." Opp'n at 12 (emphasis added). 3 Thus, defendants claim that each plaintiff must establish that she requested, and was denied, her choice 4 of title insurance provider. *See*, *e.g.*, Opp'n at 21 ("The Bargers identify no transaction where the buyer 5 wanted to choose the title insurer, but where EMC refused and required the purchaser to use a particular 6 title insurance company as a condition to the sale."). Defendants argue that this would require evidence 7 of the negotiations underlying each contract, making the issue fundamentally individualized.

8 Neither the parties nor this Court have uncovered much guidance on the meaning of Section 9. 9 A handful of courts have considered cases brought under Section 9. The analysis in these cases, 10 however, sheds little light on the question before the Court. In *Hopkins v. Horizon Mgmt Servs., Inc.*, 11 515 F. Supp. 2d 649 (D.S.C. 2007), *aff'd*, 302 Fed. App'x 127 (4th Cir. 2008), for example, the court 12 faced a motion for class certification similar to the motion currently before this Court. *Id.* at 651-53. 13 The court granted summary judgment for the defendants, and denied the plaintiffs' motion for class 14 certification, based on the undisputed evidence that the sellers had paid for the title insurance policy. 15 *Id.* at 655 (noting that "[a] December 6, 1977, HUD Opinion stated that 'where the seller purchases and 16 pays for the title insurance at no cost to the buyer, Section 9 should not be a cause for concern'"). In 17 *Rendler v. Gambone Bros. Dev. Co.*, 182 F.R.D. 152 (E.D. Pa. 1998), on the other hand, the court 18 certified a class action brought under Section 9. *Id.* at 160. *Rendler*, however, did not involve 19 allegations that the defendants' form contract violated RESPA. Rather, in a brief analysis, the court 20 concluded that the predominance requirement was satisfied based upon plaintiffs' allegations of 21 "standardized oral representations contain[ing] significant legal or factual questions which are common 22 to the class." *Id.* at 159-60 ("This case concerns whether defendants' policy and practice with regard 23 to the selection of a title insurer violated RESPA."). Finally, in *Zaldana v. KB Home*, 2009 WL 24 330944 (N.D. Cal., Feb. 10, 2009), the court denied a motion to dismiss a class action lawsuit that was 25 based upon a violation of Section 9. *Id.* at *3. Although the plaintiff had signed a disclosure informing 26 him that he was free to choose the title insurer, the court found that the plaintiff could nevertheless prove 27 that "he was required to use First American [for title insurance] as a condition for the purchase of the 28 subject property . . . by some other document or by [defendant's] conduct." *Id.*

6

1 In addition to this sparse case law, the Department of Housing and Urban Development ("HUD") 2 has promulgated regulations under RESPA. These regulations, however, largely beg the question 3 currently before the Court. *See* 24 C.F.R. § 3500.2 (defining "required use" to mean "a situation in 4 which a person must use a particular provider of a settlement service in order to have access to some 5 distinct service or property, and the person will pay for the settlement service of the particular provider 6 or will pay a charge attributable, in whole or in part, to the settlement service"). The Secretary of HUD 7 has also issued a number of informal opinions interpreting Section 9. These opinions, however, 8 generally describe indirect methods of requiring a buyer to use a particular title insurance company. 9 They do not speak to form contracts or otherwise elucidate the standard for "required use." *See* Katz 10 Decl., Exh. 11 (stating that requiring a purchaser to pay "an additional fixed fee . . . in the event such 11 purchaser retains a title insurance company other than the company originally used by the firm" would 12 "serve to indirectly require the use of a particular title insurance company"); Katz Decl., Exh. 12 (same 13 for requiring a buyer "to pay . . . attorney's fees and administrative costs in connection with the closing" 14 if the buyer selects his own title insurance company); Katz Decl., Exh. 13 (requiring buyer to use a 15 particular attorney violates Section 9 if that attorney requires the use of a specific title insurance 16 company).

17 With this sparse guidance to go on, the Court concludes that class certification is not appropriate 18 in this case. Fundamental to plaintiffs' motion for class certification is plaintiffs' view that the real 19 estate sales contracts, standing along, conclusively establish that defendants violated Section 9. This 20 view, however, ignores the fact that real estate sales are negotiated transactions. Although the majority 21 of real estate sales may occur pursuant to form contracts, the existence of a term in a form contract does 22 not, as a matter of law, establish that the parties did not bargain for that term. Nor is it necessarily true 23 that the author of the form contract "required" every term contained therein.

24 Instead, the Court agrees with defendants that evidence of the negotiations between the parties 25 is relevant to the determination whether a violation of Section 9 occurred. The language of Section 9, 26 although not entirely clear, supports this conclusion. The section limits its reach to those situations 27 where the use of a particular title insurance company is "a condition to selling the property." 12 U.S.C. 28 § 2608. "Condition" is not a word without ambiguity. *See* Black's Law Dictionary (9th ed. 2009) ("It

is recognized that 'condition' is used with a wide variety of . . . meanings in legal discourse."). Nevertheless, it is most frequently used to describe an explicit requirement of a contractual relationship. *See id.* (defining "condition" as "[a] future and uncertain event on which the existence or extent of an obligation or liability depends; an uncertain act or event that triggers or negates a duty to render a promised performance"); *see also* 24 C.F.R. § 3500.2 (defining "required use" to mean "a situation in which a person *must use* a particular provider of a settlement service" (emphasis added)). Thus, the statutory language suggests that Section 9 prohibits more than a seller's proposal that the parties use a "particular title company." Similarly, the fact that the seller chose the title insurance provider, while relevant, is not necessarily dispositive of the issue. Rather, the parties' negotiations may demonstrate that the use of a particular title insurance company was not treated as a condition. At a minimum, defendants have the right to present in their defense evidence that the plaintiffs either suggested the title insurance provision, or accepted it under circumstances indicating that they had no objection to it.[2] *Cf. In re Salomon Analyst Metromedia Litigation*, 544 F.3d 474, 485-86 (2d Cir. 2008) ("Hence, the court must permit defendants to present their rebuttal arguments before certifying a class." (internal quotation marks omitted)).

The facts of the transaction engaged in by representative plaintiffs Mr. Barger and Ms. McCoy provide a good example of the reason defendants must be allowed to present evidence of the negotiations between the parties. When these plaintiffs made their initial offer on the property, their proposal – which was on a California Association of Realtors form contract – indicated that the seller would pay for title insurance. Salemi Decl., Exh. 6 at 2. In the space used to identify the title insurance provider, plaintiffs hand wrote "seller's choice." *Id.* When EMC accepted plaintiffs' offer, however, the parties used EMC's form contract to finalize the sale. That contract provided that EMC would choose the title insurer and that plaintiffs would pay for the title insurance policy. *See* Salemi Decl., Exh. 9. It does not appear that plaintiffs ever requested a particular title insurance provider or objected to the provision in defendants' counteroffer that defendants would select the title insurance provider.

---

[2] In reaching this conclusion, the Court does not accept defendants' proposition that a seller must explicitly condition a sale on the use of a particular title insurer to violate Section 9. Rather, the Court concludes only that the question cannot be satisfactorily resolved simply by reference to a provision in a form contract.

8

*See* Salemi Decl., Exh. 4 at 122, 131-32, 158, Exh. 5 at 26. In fact, plaintiffs testified in their depositions that they did not have particularly strong feelings about what company they would acquire their title insurance policy from. *See* Salemi Decl., Exh. 4 at 35, Exh. 5 at 22. Thus, it does not appear that the title insurance provision in plaintiffs' contract was contested or amounted to anything other than a minor, routine detail in an otherwise complicated transaction. In fact, the negotiations themselves demonstrate that plaintiffs were willing to abide by defendants' choice of title insurance provider.

Ultimately, the Court cannot conclude that the form contracts plaintiffs rely on will be sufficient to resolve defendants' liability on a classwide basis. In other Section 9 cases, such as a case in which the plaintiff alleges the defendant had a practice of requiring a particular title insurance provider, class certification may be appropriate. *See*, *e.g.*, *Rendler*, 182 F.R.D. at 159-60 (granting class certification based on defendants' "policy and practice with regard to the selection of a title insurer"); *Zaldana*, 2009 WL 330944 at *3. Here, however, plaintiffs' complaint contains no such allegations, and plaintiffs have presented no evidence that such was the case. In fact, the only evidence before the Court is that the term specifying the title insurance provider was negotiable. *See*, *e.g.*, Salemi Decl., Exh. 16 at 117-18; Declaration of Laura A. Branca, ¶¶4-10 (stating that "[i]f the buyers or their brokers had negotiated on the issue of title insurance, the contract would be modified to reflect what the parties had agreed to"); Declaration of Kevin Rumsey, ¶¶4-6 (stating that title insurance provider was subject to negotiation).

Plaintiffs argue that this Court should look only to the contracts because RESPA is a remedial statute entitled to a broad construction. *See Johnson v. Wells Fargo Home Mortg., Inc.*, 635 F.3d 401, 417 (9th Cir. 2011). While this may be true, the fact that it is remedial does not obviate the need to provide the affected parties with an opportunity to explore all the facts relevant to its application in a given transaction.

Plaintiffs also argue that evidence of the parties' negotiations are made inadmissible by the parol evidence rule. "[T]he parol evidence rule bars the use of any extrinsic evidence of prior or contemporaneous negotiations or agreements at variance with the written agreement." *Oracle Corp. v. Warranty Corp. of America*, 2005 WL 226163, at *2 (N.D. Cal. 2005). The parol evidence rule, however, applies to disagreements over the meaning or content of contractual provisions. *See*, *e.g.*, *First Nat. Mortg. Co. v. Federal Realty Inv. Trust*, 631 F.3d 1058, 1067 (9th Cir. 2011) ("[U]nder the

9

California parol evidence rule, '[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.'" (quoting *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 37 (1968))). There is no such disagreement here. The evidence of negotiations will not be used to interpret the contract, but to understand whether the defendants engaged in conduct that violates RESPA.

Plaintiffs have not established that common questions predominate over individual ones. Accordingly, the Court finds that certification of the proposed class would not be appropriate.[3]

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES plaintiffs' motion for class certification. Docket No. 42.

**IT IS SO ORDERED.**

Dated: October 7, 2011

SUSAN ILLSTON
United States District Judge

---

[3] On June 1, 2011, the parties submitted a Joint Statement Regarding Discovery to the Court. It is unclear whether the discovery dispute underlying that statement remains at issue. To the extent that this Order does not resolve the dispute, the parties may file letter briefs pursuant to this Court's Standing Orders.